So we're going to begin argument with Ruiz v. Citibank. Good morning. My name is Muriel Stephen Walsh. I'm with the Pomerantz Firm on behalf of the plaintiff appellants in this case. May it please the court, the issue before the court is whether or not the district court improperly denied certification pursuant to Rule 23 for two narrowly defined classes of branches in New York and Illinois. Now significantly, class certification discovery focused on a sample group of personal bankers. This sample group was ordered by the magistrate, approved by the magistrate, and the group was selected and agreed upon by the parties. 100% of that sample group has testified that they were not paid for all of the overtime that they were due. And many of them testified that this was a result of Citibank's de facto practice of limiting overtime to extremely low and simply unrealistic levels. We submit that this easily meets the preponderance standard for showing that there's a common issue as to these classes. But nonetheless, the district court denied class certification, and we submit that this is erroneous on two fronts. First, we submit that the court misapplied the Supreme Court decision in Wal-Mart v. Dukes. Because You just said everybody testified consistently, all of the sample plaintiff group. Right. In discovery. But the district court, at page 22 of her opinion in the appendix, didn't say that. She said there were contradictions and heterogeneity within the group. Talks about Drago, Ho, Kosiba, Pakulin, Shen, and Winfield. So is that accurate? If I could just catch up for a moment. Shen, Special Appendix 23, Shen was never threatened or disciplined for working overtime and unable to remember being instructed to work off the clock or failing to enter overtime. There's four or five examples of that in the district court opinion. Right. The evidence is overwhelming that personal bankers were not paid all of the overtime they were due. Now, we address in our, and the defendants raised what they viewed as inconsistencies in the testimony, as the district court noted, but our reply brief addresses those witnesses at, I believe it's footnote 10. Yes, footnote 10, page 13 of our reply brief, we address the testimony of Optins, Pakulin, and Kosiba and Shen, who the defendants say that they could not recall any instance where they worked uncompensated overtime. What page of your brief is that? That's page 13 of our reply brief, footnote 10. Does that deal with all of the instances cited by the district court that I just went over? I don't know if it deals with all of the instances, but I think what the district court misapprehended in the testimony is the reason why the overtime was worked. Some people testified that overtime was worked for sales goals purposes, and other people testified for job duties, and I think the district court focused on the fact that some people might not have had to work overtime just to meet their sales goals, but our theory has never been that the overtime was necessary due solely to the sales goals, but it was a combination of sales goals plus meeting the other personal banker's duties, and all these duties were dictated by Citibank's corporate policies. Now, going back to the Dukes issue, the district court erred because she applied the exact same analytical framework that was applied in Dukes, even though the elements of the underlying claims in that case and our case are fundamentally different. Everybody agrees that the underlying claim is critical in deciding whether or not we've that somebody worked unpaid overtime, and that the defendant knew or should have known about that. Only two elements, but the court required the additional proof that we showed that the managers exercised their discretion in a uniform fashion, not only across the New York and Illinois classes, but across Citibank nationwide, and she required proof that this policy existed, not just proof that there's an issue as to whether or not it existed, but proof that it actually existed on a record of only 30 sampling PBs and opt-ins. That was an impossible standard. We never could have met that standard by any stretch of the imagination, and I'd like to – You agreed to that, right? You agreed to the approach. You just said that earlier. I know that was somewhat disputed in the briefs, whether plaintiffs agreed to the 15 and 15 sample. Yes. We agreed to it. The magistrate ordered it, and the defendants agreed to the sampling group. How can you complain about it now? They assist in the selection. How can you complain about it now if you agree that's the right approach for the class certification decision? Well, when – at the time that we agreed upon the sampling group, we were before the magistrate, and it was the magistrate who said, you know, I don't see that – we went before the magistrate because the defendants wanted to take testimony from all of the opt-ins to the collective case. There were 296. They didn't want that to happen. And we said, well, these cases don't operate that way. You don't get to, you know, depose every single opt-in in a FALSA case. You have to go by representative sampling, and the magistrate agreed with that. The magistrate didn't have to agree with that, and if the judge – So I guess my question is, below it seemed like you were saying we can rely on a sample and we'll be able to show a common policy through use of the sample. Absolutely. And I'm – I don't really understand the argument, your complaint about the district court looking at how – whether branch managers exercise discretion. I would think that what you have to show here is that there's anecdotal evidence – that's what you're relying on – of sufficient scale that we can extrapolate from this evidence to all those – to all branch managers to say that whatever the pressures were, the pressures of reducing overtime and maintaining productivity were such that the response was common, that they had people working overtime and not being paid for it. Right. And so you've said this morning that you say everyone in the sample has testified that they worked overtime and were not paid for it. How else do we extrapolate from what you say the sample shows? What else does it show? What else does it – well, it certainly shows that they testified not only that they were not paid for all the overtime work, but it shows – it goes to the issue of Citibank's constructive knowledge of the unpaid overtime. And I think the court erred by comparing our evidence to the first – I mean, the court initially said, okay, I'll compare the evidence to the New York class overall, which is – the denominator would be 2,000 there. But the district court said, well, that's unfairly generous to the plaintiffs. I'm going to compare against the 6,000 personal bankers nationwide. And that was – that imposed a burden that was far too high for us to meet just to show a common issue of class certification. Again, all we need to show is there's a common issue. We don't need to prove that this went across the entire class, and we certainly didn't need to prove that this went across Citibank nationwide. When was the earliest that that – that the argument you're making here was raised in the district court with respect to the analysis that was being undertaken? I'm sorry. I don't think I understand. When did you make that argument to the district court? I mean, did you have it in mind at the time that you agreed to the sampling? We agreed to – well, the magistrate is the one that ordered the sampling group. Right. And we argued to the district courts, you know, clearly on class certification, that the sampling group supported our theory of a de facto policy of not paying overtime. And what about the district court's position that you had to show this essentially across the nation? Oh, we – so on the motion for reconsideration, we raised that, and the court rejected it. So, going back to the Duke's issue, the court found it dispositive that we can prove an exercise – a uniform exercise of discretion across the class, and that that was simply not required. In Duke's, proof of subjective intent is part of the claim of proving discrimination. And as Justice Scalia said, the question, why was I disfavored, can be answered many different ways, and that's why in Duke's, the class simply cannot be certified unless you had evidence, company-wide evidence, of discriminatory intent. And so, by imposing this requirement, the court – this was fatal to the analysis on class certification, because by finding that we can show a uniform exercise of discretion, the court concluded that we cannot show a common issue as to this practice. So that was the first error, and then the second error is – which has been sprinkled throughout my argument – is the level of proof that was required at class certification. The court required that we prove a policy across the country by preponderance of the evidence, just to show that there's a common issue that the policy may have arisen. The court agreed that whether or not Citibank had a de facto policy of not paying overtime was an issue that could drive the litigation under Duke's. She agreed that this issue will drive the litigation, but she said since we couldn't prove the policy that we would lose on class certification, this was unduly prejudicial. It held us to a trial standard. The decision in Bell v. PNC – that's a Seventh Circuit decision – came out the opposite way. The Seventh Circuit there held that you don't have to prove the policy if it's – PNC alleged substantially similar facts, substantially similar theory to what we have here, and the Seventh Circuit say you don't have to prove the policy of class certification. All you have to show is that there's evidence of a common issue as to whether or not it arose. Thank you. You've reserved three minutes for rebuttal, Ms. Walsh. Thank you. Mr. Linthos. Good morning. Good morning. May it please the Court, my name is Tom Linthorst and I represent Citibank. This is not a case where the variations in the evidence merely are that managers acted unlawfully in different ways. It is a case where the record is replete with evidence that managers didn't act unlawfully at all. The plaintiffs pled that the two competing lawful policies that they claimed – on the one hand, pressure to meet sales goals, and on the other hand, efforts to control the amount of overtime worked – would operate to common effect and result in a class-wide violation of the law in failing to pay for all-time work. Now, they attempted to show that not with statistics and not with expert testimony, but solely with individual anecdotes. But as the district court found, none of these factors in the two alleged policies were uniform across the classes based on plaintiff's own testimony and the testimony of the sample. These are the people with the most fervent desire to prosecute their claim. These are the ones who opted into the case. These are the ones that further agreed to participate in discovery. And even looking at that sample, of whatever scale it was, there was sufficient variation in their experiences that the district court concluded that these two lawful policies did not operate with common effect. Your adversary says that all of the opt-in plaintiffs did testify that they worked uncompensated overtime. That's not true, Your Honor. For example, New York opt-in, Mr. Picoulin, could not recall a single instance where he worked uncompensated overtime. And I invite the Court to look at the testimony that the plaintiff cited in footnote 10, because he doesn't say in that testimony that he did work uncompensated overtime. The other two individuals that they cite in footnote 10 gave conflicting testimony, diametrically opposite testimony. The testimony we cite, where they said, I don't recall ever working uncompensated overtime. And then later when they changed that testimony. Whatever that inconsistency might say for them, it could not be extrapolated across the class. And you could not take Mr. Picoulin's testimony that he could not recall a single instance of uncompensated overtime and extrapolate that across the class. You could not adjudicate the claims, the overtime claims, of 2,500 absent class members against them because Mr. Picoulin said, I can't recall any uncompensated overtime. But the theory that they posited to the District Court as to why we could extrapolate from the sample to the class was that these two lawful policies operated uniformly. But sales goals were not uniform. There was over 300 percent difference in the goals in certain instances. Pressure to meet sales goals was not uniform. Plaintiff Ho testified it was so easy to meet sales goals that she regularly doubled and tripled them. Discipline for failing to meet sales goals was not uniform. Plaintiff Winfield met goals in two months out of two years and was never disciplined. Nor was the alleged pressure to limit the amount of overtime work uniform. All of the plaintiffs and opt-ins recorded and were paid overtime. And some were paid overtime in almost all of their pay periods, like New York opt-in Picoulin. It's not surprising that he testified that he couldn't recall any uncompensated overtime because he was paid overtime in 97 percent of his pay periods. Opt-in Kosova, 99 percent, Dabrowski, 94 percent, Moline, 85 percent. These people have a very different experience with the pressure to limit overtime work when they're- Are you right that 47 percent of the personal bankers sampled received overtime? 45 percent, no, all of the sample received overtime. They collectively received overtime in 45 percent of their pay periods. So it wasn't a rare occurrence. But even within that, there was variation. Some received it less often and four or five of them received it almost every single pay period. And so Citibank pays overtime, millions in overtime to personal bankers every year. They posited of a no overtime policy. They posited that pressure was so extreme that the goal was zero. Well, that clearly was not uniform because many, even within the sample, received overtime in the vast majority or all of their pay periods. And the experience of what the Citibank actually paid was even. There never was any significant reduction in overtime paid to personal bankers at an aggregate level. And there certainly was never anything close to zero in terms of overtime actually paid. So given this variation, it's not surprising that the district court found differences in the sample on key issues of liability such as whether the personal banker worked overtime. Some said they needed to work overtime in order to complete their job duties. Some said they did not. Plaintiff Winfield testified that whether you would need to work overtime in order to complete all of your job duties, not just sales goals, but all of them, quote, depended on the individual banker, unquote. It's the opposite of common proof. Testimony varied based on whether the personal banker recorded all of their time in Citibank's timekeeping system. Some of them said they did. Some of them said they did not and some of them said they did. Testimony varied whether they were paid for all time they recorded. Some claimed that they were not paid for all time they recorded. Plaintiff Ruiz, who is our sole New York class representative, testified that she was directed to record all of her time worked. She did not report her time in the timekeeping system. Her manager never told her not to do that and she undertook steps to actively hide the amount of overtime that she worked from her managers. Testimony varied on whether they ever worked any uncompensated overtime at all by the testimony of Mr. Pickling and others. And the district court also found key differences in whether the supervisor knew or should have known of the alleged uncompensated overtime. Some claimed their managers knew. Plaintiff Ruiz testified that it would have been, quote, almost impossible, unquote, for her manager to know her hours of work. And in the few instances in the record where there was confirmed instances of off-the-clock work with employer knowledge, the evidence was uniform that Citibank investigated and remediated with the payment of overtime to address the situation. And that's the two examples that the district court cited where a group of personal bankers at one branch were paid the highest amount that any one of them estimated and Optin Shorenstein was paid $12,000. Nor do the emails that plaintiffs point to answer any common question in this case. Most significantly, none of them reflect unlawful conduct. That is, failing to pay for overtime that has been worked. Not one. To the extent some of them express a desire to limit the amount of overtime worked, they reflect managers doing exactly what the FLSA was designed to do. As this court said in Chau v. Gotham Registry, one of the purposes of the FLSA is to, quote, apply financial pressure on employers to reduce overtime, unquote. Evidence of managers acting unlawfully in precisely the way intended by the FLSA is not common proof of a class-wide violation of the law. But even as to the efforts to limit the amount of overtime worked, as the district court found, they were not uniform, and the overtime experiences of the plaintiffs varied greatly. Can I ask you about Dukes? Yes. And its application here? Doesn't it make a difference that in Dukes it had to be shown that the managers acted intentionally to discriminate on the basis of sex in that case where you don't need to show that here, where they don't need to show that here? I think Dukes needs to be applied in the context of this case, but this case is particularly analogous to Dukes because what plaintiffs allege here is that individual managers across a thousand locations nationwide acted unlawfully in implementing lawful policies. So the district court examined within the record, within the sample, whether there was consistent unlawful conduct in reaction to these policies, and where it found a lack of such conduct, it said there's no basis to extrapolate this evidence across the class. So the evidence is evaluated for its capacity to prove class-wide violations of the overtime laws. But even within that context, when the allegation here is not that there was any express policy to deny overtime for actual work, but a de facto policy, which means it can only be gleaned from the actual conduct of the managers across the class, and when there was significant evidence of managers not acting unlawfully and acting lawfully, consistent with Citi's Bank's policies that require them to act lawfully, there was no basis to extrapolate that evidence across the class. That evidence would not generate a common answer showing unlawful conduct. The district court engaged in the rigorous analysis required by the Supreme Court in this Court. It reviewed the voluminous record. It analyzed the applicable authorities. And it reached a decision that we submit as absolutely correct, but at a bare minimum fell within the range of permissible decisions and was not an abuse of discretion. Counsel for plaintiffs indicated that the district court acted improperly. That's not the standard. It's an abuse of discretion standard. And as this Court said in Myers v. Hertz, there's a range of permissible decisions in which the district court is free to exercise its discretion. And I would note that the cases that plaintiffs rely on in other circuit authority like Bell and Ross are cases in which the district court granted certification and that court was reviewing those decisions for an abuse of discretion. And the fact that the district courts in those cases did not abuse their discretion on those facts does not indicate that the district court abused its discretion here. Thank you. Thank you very much. Ms. Walsh, you've reserved three minutes for rebuttal. While my adversary was talking, I had a moment to look back through the district court's opinion, citing the testimony of people who supposedly said they were not paid overtime. And it's limited, the citations of the district court are limited to the three witnesses that we address at footnote 10. So just to give Your Honor a definitive answer on that. I counted six, but you talked about three in your footnote, I thought. The court. I'll check it. Don't spend your time on that. Some of the citations the court relies on goes to the issue of sales goals and whether or not the sales goals require the payment of overtime. But I'd like to address the point that defendant relies on so heavily that Citibank paid some overtime to its personal bankers during the class period. And we've never disputed that it did. What we've disputed, our theory is that Citibank had to limit overtime pay to unrealistic levels. And that because of this pressure, it did not pay all the overtime that was due. Now the fact that they pay some overtime to the class does not absolve them from paying all the overtime that was due. And 45% paychecks, some paying 40% paychecks, that's a meaningless number without knowing how much overtime was actually paid. And it's certainly meaningless when compared to against all the overtime that was actually due. And I'd like to point out that in terms of proving the overtime, we do have a source of class-wide evidence. The audit logs, which the defendant fails to cite here. And they've always avoided discussion of the audit logs and for good reason. Because it certainly hurts their defense that we don't have a common issue. The audit logs were maintained by Citibank during the relevant period so that they could cross-check their personal bankers' time entries and make sure that the personal bankers weren't charging Citibank for more overtime that they were due. The audit logs recorded the bankers' log-in and log-out times on their computers. And they certainly serve as a strong starting point for proving the overtime that was worth and not due. We can take the audit logs and compare them to the time records and the pay subs. And after that, it's a matter of mere math. Now in terms of the constructive knowledge aspects of the claim, that can certainly be amenable to class-wide proof. The audit logs certainly further along the proof in that regard. If we prove that there was a de facto policy of not paying overtime at trial, that will certainly further our case in terms of constructive knowledge and in terms of proving willfulness. Which is not an element of the Prima Foschi case, but it would certainly go towards the statute of limitations. So we can prove constructive knowledge by class-wide proof. The defendant has pointed out numerous alleged variations that they say defeat commonality. Most of these variations are irrelevant to proving the actual claim. Many of them, a lot of these are just smoke and mirrors. The fact that some people worked overtime to meet their sales goals, while some people were pushed into overtime because they had to meet with a customer after hours, doesn't get away from the common issue of whether or not these people were paid for all the overtime when it was worked. And it doesn't get away from the common issue of whether or not Citibank's directives strongly limiting overtime to crazy, even to zero levels, resulted in a pattern of overtime violations. And on that point, I'd like to note that during the relevant period, Citibank paid approximately $2 million in overtime a year. So they did pay some overtime. It hovered suspiciously at the same level throughout the entire relevant period. After our case was filed, and after it was certified, Citibank's overtime pay doubled from $2 million to $4 million. Which we think, at least for purposes of drawing inferences on this classification motion, certainly undercuts their argument that they paid all the overtime that was due. Thank you. Thank you. Thank you, Ms. Walsh. Thank you both. We'll reserve decision. The next case for argument is 2-0 versus Orange Regional Medical Center. Orange Regional Medical Center. Why don't you wait just a second, Mr. Deidre? Would you like to leave now, or would you want to stay and leave? Yeah, no, that's fine. Thank you. Just wanted to give you time.  I may please the court.